J. A18011/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| STACEY CARLITZ, EXECUTRIX OF THE | : | IN THE SUPERIOR COURT OF |
| ESTATE OF JACQUELINE D. CARLITZ, | : | PENNSYLVANIA |
| DECEASED AND ALAN S. CARLITZ | : | |
| | : | |
| v. | : | |
| | : | |
| DELTA MEDIX, P.C. AND | : | |
| JEFFREY W. GUSE | : | No. 1370 MDA 2015 |
| | : | |
| APPEAL OF:  JEFFREY W. GUSE | : | |

Appeal from the Order Entered July 15, 2015,
in the Court of Common Pleas of Lackawanna County
Civil Division at No. 11-CV-1458

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND STEVENS,* P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED APRIL 04, 2017**

In this medical negligence action, the verdict winners below,

Delta Medix, P.C. ("Delta Medix") and Jeffrey W. Guse ("Guse") (collectively,

"defendants"), appeal from the trial court's order granting a new trial to

plaintiffs, Stacey Carlitz, Executrix of the Estate of Jacqueline D. Carlitz

("Mrs. Carlitz"), deceased, and Alan Carlitz ("Mr. Carlitz") (collectively,

"plaintiffs," "appellees," and/or "the Carlitzes"), who had sought

compensation for injuries sustained by Mrs. Carlitz while she was being

---

* Former Justice specially assigned to the Superior Court.

treated by Delta Medix and Guse.[1]  The trial court granted plaintiffs' motion for a new trial based upon defendants' exposing the jury to a new theory of causation in violation of a pre-trial order precluding that theory.  On appeal, Guse maintains that there were no violations of that order and, therefore, that a new trial is not warranted.  Furthermore, because the jury found that the standard of care had not been violated by Guse, and consequently did not address the matter of causation, Guse contends that any violation of the pre-trial order that did occur was harmless error.  After careful review, we affirm the order granting a new trial.

The trial court briefly summarized the pertinent facts as follows:

> Plaintiffs brought the underlying medical negligence action against Defendants . . . seeking redress for alleged injuries resulting from [Mrs.] Carlitz's fall during a urology appointment. On March 3, 2009, [Mrs.] Carlitz visited the offices of Defendant Delta Medix for the purposes of a urology diagnosis and treatment.  After arriving at the ultrasound room, Defendant Guse instructed [Mrs.] Carlitz to transfer from her wheelchair to the examination table.  During the course of the transfer from the wheelchair to the examination table, under the supervision of Defendant Guse, [Mrs.] Carlitz stepped onto a small step stool at the end of the table to attempt to mount the table.  At that time, she fell to the ground and allegedly sustained serious orthopedic injuries.
>
> Plaintiffs commenced this litigation by filing the Complaint on March 2, 2011.  On August 19, 2014, Defendant Guse's expert witness, Dr. Jack Henzes,

---

[1] For the reasons discussed *infra*, Guse is the only remaining appellant in this case.

submitted an expert report which provides in pertinent part:

> The mechanism of the patient's injury would be due to the osteoporotic state of her bones . . . The records reflect that Mr. Guse was assisting her at the time she lost her balance and fell.

(Henzes Expert Report, at 2). The clear theory of causation [wa]s that Plaintiff lost her balance and fell with fractures resulting due to osteoporosis, hence it is the mechanism of injury. On April 21, 2015, counsel for Defendant Guse attempted to submit an untimely supplemental expert report six days before trial in violation of the Scheduling Order. This report, also by Dr. Henzes, dated April 20, 2015, states:

> To be clear, and not to mislead anyone, it is my opinion that the cause of [Mrs.] Carlitz's fall was the osteoporotic condition of her bone. This condition[,] with the normal stress of pivoting, led to a spontaneous fracture of her ankle which caused her to fall at Delta Medix.

(Henzes Supplemental Expert Report, at 1). The new theory of causation [wa]s that Plaintiff had a spontaneous fracture of an osteoporotic ankle which caused her to then fall. This new theory was, in our view, in opposition to Dr. Henzes' original theory of causation. On the same day, Plaintiffs filed a Motion in Limine to exclude Dr. Henzes' supplemental expert report and testimony regarding the same, claiming that the supplemental report lists a different causation theory than the original expert report and indicating that due to its untimeliness Plaintiffs cannot formulate an expert's opinion in response. (emphasis added). On April 27, 2015, this Court issued an [o]rder [(hereinafter, "Court Order")] on the record granting Plaintiffs' Motion in Limine to exclude the supplemental expert report and any reference thereto.

Trial court opinion, 7/15/15 at 1-3.

A jury trial was held from April 27 to May 1, 2015. On the final day of trial, the jury returned a verdict in favor of defendants, Guse and Delta Medix. Plaintiffs moved for a new trial based on, *inter alia*,[2] Guse's counsel's repeated violations of the Court Order. By order accompanying the court's July 15, 2015 opinion, the court granted plaintiffs' motion for a new trial due to defendants' "reckless insertion of an excluded and new causation theory" at trial that "was highly prejudicial to" plaintiffs.[3] (Trial court opinion, 7/15/15 at 9.)

On August 12, 2015, Guse and Delta Medix each filed a timely notice of appeal from the trial court's order granting a new trial to plaintiffs/appellees, at No. 1369 MDA 2015 (Delta Medix) and No. 1370 MDA 2015 (Guse). However, by stipulation, the parties agreed to dismiss Delta Medix, rendering the appeal at No. 1369 MDA 2015 moot.

---

[2] Plaintiffs also sought a new trial based on the theory that the jury was tainted by the trial court's failure to strike certain jurors for cause; specifically, those jurors who had some direct or indirect relationship to Delta Medix. The trial court rejected this claim, *see id.* at 10-20, but that ruling is not at issue in this appeal.

[3] The trial court indicated that it initially denied plaintiffs' request for mistrial during trial in "an effort to prevent a waste of resources." (Trial court opinion, 7/15/15 at 9.) The court explained: "The third violation of the Court Order occurred roughly half way through the trial, and rather than declaring a mistrial, the [c]ourt believed the correct approach would be to move forward with the trial since [if] the Plaintiffs . . . prevail[ed], . . . the issue would . . . become moot." (*Id.*)

Accordingly, this court dismissed Delta Medix's appeal on December 1, 2015. Thus, Guse is the only remaining appellant in this matter.

The trial court did not enter an order directing Guse to file a Pa.R.A.P. 1925(b) statement, nor did the court file a Rule 1925(a) opinion. The trial court also failed to file a statement in lieu of a Rule 1925(a) opinion. Nevertheless, for purposes of our review in this case, the trial court's July 15, 2015 opinion adequately addresses the issue(s) raised by Guse on appeal. Accordingly, we do not deem it necessary to remand for the filing of a Rule 1925(a) opinion or a statement in lieu thereof.

Guse now presents the following questions for our review:

> 1. Did the trial court abuse its discretion in granting a new trial because the conduct of defense counsel mentioned by the trial court is not sufficient to justify the award of a new trial where all questions were not in violation of any order, were waived by Plaintiffs, were adequately cured, and/or were properly related to admissible evidence?
>
> 2. Did the trial court abuse its discretion in granting a new trial because any alleged violation of the April 27, 2015 Order was harmless where the jury found [appellant] did not violate the standard of care and did not reach the issue of causation?

Appellant's brief at 4.

Guse attacks the court's decision to grant a new trial on several fronts.[4] First, Guse alleges that the Court Order was itself an abuse of the court's discretion. Second, he claims that even if the Court Order was not an abuse of the court's discretion, it was not violated on the three occasions cited by the trial court. Third, Guse contends that the Carlitzes were untimely with respect to certain objections to the alleged violations of the Court Order, resulting in waiver. Fourth, Guse asserts that the purported violations of the Court Order were harmless error, as they solely concerned theories of causation, and the jury found that Guse did not violate the standard of care, and therefore never reached the issue of causation. Fifth, Guse argues that any such violations were rendered harmless by the court's contemporaneous curative instructions.

Our general standard of review of a trial court's decision to grant a new trial is well settled:

> Trial courts have broad discretion to grant or deny a new trial. *Martin v. Evans*, 551 Pa. 496, 711 A.2d 458, 461 (1998); *Morrison v. Commonwealth, Dept. of Public Welfare*, 538 Pa. 122, 646 A.2d 565, 570 (1994); *Coker v. S.M. Flickinger Co., Inc.*, 533 Pa. 441, 625 A.2d 1181, 1184 (1993). "The grant of a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings." *Dornon v. McCarthy*, 412 Pa. 595, 195 A.2d 520, 522 (1963).

---

[4] For ease of disposition, the arguments have been reordered from the sequence in which they appear in Guse's brief.

> Although all new trial orders are subject to appellate review, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial. ***Morrison***, 646 A.2d at 570; ***Coker***, 625 A.2d at 1187; ***Spang & Co. v. U.S. Steel Corp.***, 519 Pa. 14, 545 A.2d 861, 865 (1988); ***Atene v. Lawrence***, 456 Pa. 541, 318 A.2d 695, 697 (1974); ***Kralik v. Cromwell***, 435 Pa. 613, 258 A.2d 654, 656 (1969).

***Harman ex rel. Harman v. Borah***, 756 A.2d 1116, 1121-1122 (Pa. 2000).

In ***Harman***, our supreme court meticulously laid out the process of appellate review of a motion to grant or deny a new trial as follows:

> Each review of a challenge to a new trial order must begin with an analysis of the underlying conduct or omission by the trial court that formed the basis for the motion. There is a two-step process that a trial court must follow when responding to a request for new trial. ***Morrison***, 646 A.2d at 571; ***see Riccio v. American Republic Insur. Co.***, 550 Pa. 254, 705 A.2d 422, 426 (1997). First, the trial court must decide whether one or more mistakes occurred at trial. These mistakes might involve factual, legal, or discretionary matters. Second, if the trial court concludes that a mistake (or mistakes) occurred, it must determine whether the mistake was a sufficient basis for granting a new trial. ***See Spang***, 545 A.2d at 868. The harmless error doctrine underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake. ***See Stewart v. Motts***, 539 Pa. 596, 654 A.2d 535, 540 (1995); ***Commonwealth v. Faulkner***, 528 Pa. 57, 595 A.2d 28, 39 (1991), ***cert. denied***, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992); ***Commonwealth v. Ryder***,

467 Pa. 484, 359 A.2d 379, 382 (1976); **_Dornon_**, 195 A.2d at 522.

To review the two-step process of the trial court for granting or denying a new trial, the appellate court must also undertake a dual-pronged analysis. **_Morrison_**, 646 A.2d at 571. A review of a denial of a new trial requires the same analysis as a review of a grant. **_Thompson v. City of Philadelphia_**, 507 Pa. 592, 493 A.2d 669, 673 (1985). First, the appellate court must examine the decision of the trial court that a mistake occurred.

At this first stage, the appellate court must apply the correct scope of review, based on the rationale given by the trial court. There are two possible scopes of review to apply when appellate courts are determining the propriety of an order granting or denying a new trial. **_Morrison_**, 646 A.2d at 570, **_Coker_**, 625 A.2d at 1186. There is a narrow scope of review: "[w]here the trial court articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the appellate court must review that reason under the appropriate standard." **_Morrison_**, 646 A.2d at 571.

> [Conversely,] [i]f the trial court leaves open the possibility that reasons additional to those specifically mentioned might warrant a new trial, or orders a new trial 'in the interests of justice,' the appellate court applies a broad scope of review, examining the entire record for any reason sufficient to justify a new trial.

**_Id_**[.] at 570. Even under a narrow scope of review, the appellate court might still need to examine the entire record to determine if there is support for any of the reasons provided by the trial court. **_Commonwealth v. Widmer_**, 560 Pa. 308, 744 A.2d 745, 750 (2000); **_Thompson_**, 493 A.2d at 673.

The appropriate standard of review also controls this initial layer of analysis. If the mistake involved a discretionary act, the appellate court will review for an abuse of discretion. *See Widmer*, 744 A.2d at 753 (decision whether verdict is against weight of evidence is discretionary). If the mistake concerned an error of law, the court will scrutinize for legal error. *See Morrison*, 646 A.2d at 571 n. 8 (propriety of jury instructions entails question of law). If there were no mistakes at trial, the appellate court must reverse a decision by the trial court to grant a new trial because the trial court cannot order a new trial where no error of law or abuse of discretion occurred. *See Von der Heide v. Commonwealth, Dept. of Transp.*, 553 Pa. 120, 718 A.2d 286, 290 (1998); *Atene*, 318 A.2d at 697; *Kralik*, 258 A.2d at 656; *see also Riccio*, 705 A.2d at 427 (holding that because judge, who was substituted for post-trial motions, erred in finding that trial court judge made mistake of law, grant of new trial was error).

If the appellate court agrees with the determination of the trial court that a mistake occurred, it proceeds to the second level of analysis. The appellate court must then determine whether the trial court abused its discretion in ruling on the request for a new trial. *Morrison*, 646 A.2d at 571. "Discretion must be exercised on the foundation of reason." *Coker*, 625 A.2d at 1184 (quoting P.L.E. New Trial § 2). An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. *Id.* at 1184-85. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. *Morrison*, 646 A.2d at 571. "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.* (quoting *Coker*, 625 A.2d at 1187).

> When determining whether the trial court abused its discretion, the appellate court must confine itself to the scope of review, as set forth in our preceding discussion. If the trial court has provided specific reasons for its ruling on a request for a new trial, and it is clear that the decision of the trial court is based exclusively on those reasons, applying a narrow scope of review, the appellate court may reverse the trial court's decision only if it finds no basis on the record to support any of those reasons. *Coker*, 625 A.2d at 1188. "As a practical matter, a trial court's reference to a finite set of reasons is generally treated as conclusive proof that it would not have ordered a new trial on any other basis." *Id.* at 1184; *see Widmer*, 744 A.2d at 750-51. Alternatively, where the trial court leaves open the possibility that there were reasons to grant or deny a new trial other than those it expressly offered, or the trial court justifies its decision on the "interests of justice," an appellate court must apply a broad scope of review and affirm if it can glean any valid reason from the record. *Morrison*, 646 A.2d at 570; *Coker*, 625 A.2d at 1185.

*Harman*, 756 A.2d at 1122-1124.

Under *Harman*, the first step in our review of the trial court's order granting a new trial is to determine whether a "mistake" occurred; in this case, whether the defendants violated the Court Order. As a threshold matter, however, Guse first posits that the Court Order was itself an abuse of the trial court's discretion.[5]

---

[5] Appellees assert that Guse waived this claim by failing to present it below. We disagree. Under these circumstances, we agree with Guse that he did not waive his challenge to the Court Order because there was no prior opportunity to raise the claim before the trial court beyond his initial objection to appellees' motion *in limine*.

Dr. Henzes, an orthopedist, produced an expert report dated August 19, 2014, in which he opined that Mrs. Carlitz's injuries were caused by her osteoporotic bones:

> She was asked to stand up from the wheelchair and place herself onto the exam table. The records reflect that Mr. Guse assisted her in getting out of the wheelchair by helping to support her. Once Mrs. Carlitz was able to get onto the stool, in attempting to turn and sit down, the patient fell and suffered a grade III A open fracture of her [left] ankle . . . .

Dr. Henzes' report, 8/19/14 ("First Report") at 2.

> The mechanism of the patient's injury would be due to the osteoporotic state of her bones. The pivoting that she was attempting to do would be very similar to what she would do each day, getting in and out of bed to get into her wheelchair to participate in activities at the nursing home. The only difference would be the stool that she would step up onto to sit on the exam table. The records reflect that Mr. Guse was assisting her at the time she lost her balance and fell. It does not appear that at anytime [sic] she tried to navigate onto the stool herself.
>
> It is my medical opinion that Mr. Guse and Delta Medix are not at fault for Mrs. Carlitz's ankle

---

Guse was the verdict winner in this case. Therefore, he was not obligated to challenge the Court Order through post-verdict motions in order to preserve a claim that was, at that time, at least, effectively (if temporarily) moot. Appellees sought a new trial by post-verdict motion and were successful. After Guse appealed that decision, the trial court did not order him to file a Pa.R.A.P. 1925(b) statement. Thus, Guse cannot be faulted for failing to raise his challenge to the validity of the Court Order at that time, either. Consequently, the first time Guse could have preserved his challenge to the Court Order was, in fact, in his brief to this court. Thus, we conclude that Guse has not waived his challenge to the merits of the Court Order.

> fracture. The patient did have a history of spontaneous falls in the past. The records do reflect that she was doing well in her physical therapy program, and required supervision only for her transfers.

*Id.*

So, in the First Report, Dr. Henzes indicates that Mrs. Carlitz "lost her balance" and fell off the stool, sustaining an open fracture of her left ankle due to her osteoporotic condition. There was no indication that osteoporosis actually caused Mrs. Carlitz to fall. Indeed, Dr. Henzes noted that this pivot maneuver was something that she did every day.

Six days before trial, Dr. Henzes issued a "supplemental expert report" ("Second Report") dated April 20, 2015. In this Second Report, for the first time, Dr. Henzes theorizes that Mrs. Carlitz suffered a "spontaneous fracture" of her left ankle, causing her to fall:

> To be clear, and not to mislead anyone, it is my opinion that the cause of [Mrs.] Carlitz's fall was the osteoporotic condition of her bone. This condition with the normal stress of pivoting, led to a spontaneous fracture of her ankle which caused her to fall at Delta Medix.

Second Report, 4/20/15 at 1.

The Court Order precluded the defendants from referencing Dr. Henzes' Second Report. Appellees/plaintiffs contend that the trial court initially precluded the Second Report because it presented a wholly new theory of causation (hereinafter, the "spontaneous fracture theory") not presented in Dr. Henzes' First Report. This is the position adopted by the

trial court in its opinion. (Trial court opinion, 7/15/15 at 2.) Plaintiffs requested preclusion of this "new theory" in their motion *in limine*. (*See* plaintiffs' motion *in limine*, 4/22/15 at ¶ 26 (". . .Plaintiffs are severely prejudiced by Dr. Henzes['] eleventh hour supplemental report, as it sets forth not only a completely new theory of causation, but in fact it appears to contradict [his] original report with regard to his theory of causation.").) That motion was granted by the trial court, but the court did not appear to accept or reject that interpretation in formulating restrictions on the use of the Second Report at trial. When ruling on plaintiffs' motion *in limine*, the trial court stated as follows:

> Okay, there is a matter outstanding of the [Second Report] by Dr. Henzes dated April 20th, 2015. And obviously, that's been objected to by the Foley Law Firm on behalf of the plaintiff. And the response has been--let me put it this way, chronologically, Dr. Henzes' report is dated April 20th, 2015. I get objections to that from the Foley[]s by letter dated April 21st, 2015. And response to the objections from Web[]er Gallagher on behalf of Delta Medix referencing that objection. I'm going to tell you what my inclination is before I entertain argument. My inclination is, I can't stand it when I have a case that is a 2011 case and a week before trial, we're getting reports, okay. They have their theory as to what Dr. Henzes' initial report means and you have yours. And if, in fact, his supplemental report is a clarification, then it's not adding anything new, go with the original report. So, the motion *in limine* on April 21st is granted. Okay? I don't necessarily think it has anything to do with it. I don't necessarily think the jury is going to conclude what you guys conclude. But nevertheless, I thought we needed to address it because it was outstanding.

Notes of testimony, 4/27/15 at 33-34.

Thus, the trial court clearly ruled that the defendants could not reference the Second Report, but the primary essence of the ruling, as articulated by the trial court above, was premised on the Second Report's untimeliness. The Second Report was submitted six days before trial and was excludable on that basis. Pa.R.C.P. 4003.5. The court did agree with the plaintiffs that if the Second Report presented a new theory of causation, that new theory would also be precluded under the order granting the motion *in limine*.

Appellees/plaintiffs argue that the trial court's:

> directive was clear in that Plaintiffs' motion *in limine* was . . . granted[, and that] Defendants were to stick with their original causation theory as outlined in Dr. Henzes' original expert report, that [Mrs.] Carlitz lost her balance and fell, and that her osteoporotic condition might have contributed to the severity of her injuries.

Appellees' brief at 11. We agree with appellees that the motion was granted, and that the defendants, Guse and Delta Medix, were precluded from presenting a new theory to the jury not expressed in Dr. Henzes' First Report. The difficulty is that the court failed to explicitly decide whether the spontaneous fracture theory was present in some form in Dr. Henzes' original report. The trial court's statement accompanying the Court Order suggests that it had not yet decided whether spontaneous fracture was a new theory or an elaboration on the theory presented in the First Report.

Given the lack of clarity as to the practical meaning of the Court Order with regard to the admissibility of the spontaneous fracture theory, and because Guse's argument that the Court Order was an abuse of discretion is tailored to the premise that it precluded the spontaneous fracture theory, we cannot rule that the Court Order was an abuse of discretion on those grounds.

As such, we now turn to the question of whether the Court Order was violated. The trial court held that violations of the Court Order occurred on three distinct occasions: First, during opening statements when Guse's counsel told the jury that "Dr. Henzes, Dr. Zurad will say the osteoporosis was the cause of the fall[,]" (notes of testimony, 4/28/15 at 41); second, during the direct examination of Dr. Henzes, when he testified that "[e]ither she lost her balance and fell and broke her ankle. Or as she was pivoting, the pivot maneuver would have broken her ankle and then she would have collapsed and fallen onto the floor[,]" (notes of testimony, 4/29/15 at 60); and third, during the redirect examination of Dr. Henzes, when he agreed that "a patient [can] have a break and then a fall[.]" (***Id.*** at 114.) (***See*** trial court opinion, 7/15/15 at 7 ("Notwithstanding the explicit Court Order, the record indicates that counsel for Defendant Guse and Dr. Henzes made at least three separate remarks or references to the supplemental expert report.").) The trial court found that these repeated violations of the Court Order occurred despite warnings by the court during sidebars that followed plaintiffs' objections thereto. (***Id.*** at 8.) The court did provide curative

instructions, but ultimately agreed with plaintiffs that the prejudice caused by the violations was incurable. (*Id.* at 8-9.)

We will examine each of these remarks and the accompanying sidebar discussions in turn. During opening statements, Matthew Keris, Esq., counsel for Guse, characterized Mrs. Carlitz's osteoporosis as a cause of the fall:

> Mr. Foley [(Tom Foley, Jr., Esq., counsel for the plaintiffs)] mentioned to you a whole host of the comorbidities she had. She was obese. She is 63. One of the things that he didn't mention, and both defense experts, both Dr. Henzes and Dr. Zurad, and I'll get into it a little bit more detail in [a] moment, they talk about another underlying condition she had which contributed to this fall, osteoporosis.

Notes of testimony, 4/28/15 at 31.

> One of the nurses will come and testify and say there was a statement by [Mrs.] Carlitz that she had heard a snap, then she fell. She heard a snap and then she fell. Folks, osteoporosis that's what it means. Dr. Henzes, Dr. Zurad will say the osteoporosis was the cause of the fall. Her brittle bones, a twisting motion, a turning motion with a host of factors, that we as normal healthy adults or even not so happy [sic], but most of us can handle but because she had osteoporosis she simply couldn't handle that and that process of getting up to Jeff Guse have her twist around it's the same thing she would have to do at the nursing home. She was getting into her bed, she is doing the same motion. Step up to get to her bed, stepping and twisting to get in her bed it's the same motion. It can't be predicted. It happens, brittle bones, and that's why she slumped. That is what Dr. Zurad will say and that's what Dr. Henzes will say. Dr. Henzes, he is an orthopaedic surgeon, he is a bone doctor. This is his

forte. He will testify, he will come in here and tell that to you.

*Id.* at 41-42.

Following opening statements and preliminary instructions to the jury, the plaintiffs requested a sidebar and made a motion for a mistrial:

> MR. FOLEY: Plaintiff is moving for a mistrial because Mr. Keris violated a Court's ruling excluding the new report of Dr. [] Henzes where he gave his opinion that the cause of [Mrs.] Carlitz's fall was the osteoporotic condition of her bones. Mr. Keris in his opening stated that it will show that the osteoporotic condition of her bone or the osteoporosis was the cause of her fall, and referring to Dr. Henzes and Dr. Zurad.
>
> MR. KERIS: Your Honor, it's opening argument. In his [F]irst [R]eport he mentions osteoporosis -- he mentions osteoporosis in his [F]irst [R]eport which has been in Mr. Foley's possession for awhile [sic].
>
> THE COURT: Wait, let me get it. I want to look at the first one.
>
> MR. FOLEY: I have the first one here. It's mentioned that she had mentioned that she had osteoporosis, but it doesn't say that the osteoporosis --
>
> MR. KERIS: May I -- it says, "The patient's injury isn't [sic] due to the osteoporotic state of her bones", which I also believe in your ruling on motions in limine as to getting into the second fall of that resulted in the ankle fracture. You said that we could get into the osteoporosis being a mechanism of the fall on your older one, so all of the second order is just he said if there is confusion is citing back to what he said in this [F]irst [R]eport.
>
> THE COURT: Well, I'm going to deny the motion for two reasons. I have already told the jury what the

lawyers say cannot be equated as evidence, so your argument isn't evidence, and if I told the jury that they can't decide the case based upon anything I say or what the lawyers say, but they are to decide it based upon the evidence. I would make certain that you handle that very carefully, however, when you bring in Dr. Henzes.

MR. KERIS: Before we -- I intend to ask -- before Dr. Henzes comes in I would like to have a sidebar before that so we are perfectly clear so we don't have a situation in our last trial, the Moore case, on that as well. I want to be perfectly clear on that. Thank you for giving that instruction.

THE COURT: Okay. Motion is denied.

Notes of testimony, 4/28/15 at 58-60.

Before the defendants called Dr. Henzes to the stand, they sought clarification from the trial court as to the permissible scope of his testimony on causation:

MR. KERIS: Your Honor?

THE COURT: What's on your mind?

MR. KERIS: Your Honor, before we go, Dr. Henzes is going to be presented late today and there had been a motion about the [Second] [R]eport being precluded, and I'm not quibbling about that, I'm just looking for direction from the Court as to what he can say because it's very --

THE COURT: He can say what's in his [F]irst [R]eport.

MR. KERIS: Well, can I --

THE COURT: What's in the fair scope of his [F]irst [R]eport. Why is that a problem?

- 18 -

> MR. KERIS: I don't think it's a problem, I think it's clear what he said, but I think Mr. Foley, you know, has said that it's something different. I'm not trying to quibble, I just don't see anything --
>
> THE COURT: Let me be more specific, the phraseology that he used in describing his description of how this wound might have occurred has to be that phraseology from his [First] [R]eport and not his [S]econd [R]eport.
>
> MR. KERIS: Okay.
>
> THE COURT: Fair enough?
>
> MR. KERIS: That sounds fine. Thank you.

Notes of testimony, 4/29/15 at 48-49.

Dr. Henzes is a board-certified orthopedic surgeon. (*Id.* at 51-52.) On direct examination, Dr. Henzes testified that Mrs. Carlitz's osteoporosis caused her to break her ankle:

> Q. And can you please tell the jury what your opinion is as to the causation issues in this matter?
>
> A. That her osteoporosis led her to having a low level of trauma causing her to break her ankle.

*Id.* at 58-59. Later, Dr. Henzes expounded that Mrs. Carlitz's osteoporosis could have precipitated the fall, prompting an immediate objection from plaintiffs' counsel, followed by an extensive sidebar discussion:

> Q. And what's your understanding as to the interaction between Mr. Guse and [Mrs.] Carlitz and [Mr.] Carlitz once they arrived at Delta Medix?

A.      Well, Mr. Guse was the ultrasound tech. She was brought to Delta Medix. And she was brought in a van. She was in a wheelchair. And the wheelchair, Mr. Carlitz, I believe, pushed the wheelchair into the building. And Mr. Guse took over and took her right into the exam room. He asked her if she could get out of the wheelchair to get up on the exam table. The ultrasound is generally done on the exam table. She said she could. She was able to get herself out of the chair. With the help of Mr. Guse and Mr. Carlitz, she got up on to the step that she needed to get onto to get onto the exam table. And then, as she was pivoting herself around, she either -- one of two things either [sic] happened. Either she lost her balance and fell and broke her ankle. Or as she was pivoting, the pivot maneuver would have broken her ankle and then she would have collapsed and fallen onto the floor.

MR. FOLEY:      Objection, can we approach, your Honor?

THE COURT: Sure. Dr. Henzes, want to stand down and just give us a moment?

(The following discussion was held at sidebar.)

MR. FOLEY: Your Honor, there is no reference in the report of Dr. Henzes of August 19th of the pivoting that resulted in the breaking of the ankle.

THE COURT:      I want to call your attention to the second paragraph, 0488, where she [sic] talks about the --

MR. FOLEY: Pivoting and attempt to do it, but he doesn't list that as the cause. And he's talking about causation here. The cause that it states here is that she lost her balance and fell.

THE COURT: Let me just look at the paragraph. Give me a second. Okay, make your objection again?

MR. FOLEY: This is the theory that they're getting into on the [S]econd [R]eport that they've been told that they are to stay away from. He's attempting -- Dr. Henzes was led into that depiction that [Mrs. Carlitz] was pivoting at the time and that that was the cause of her falling. And the cause of her falling in this report is that she lost her balance and fell. This is a causation issue and they're trying to back door what they've been attempting to do by the [S]econd [R]eport.

MR. FEENEY [(GENE FEENEY, ESQ., COUNSEL FOR DEFENDANT DELTA MEDIX)]: Your Honor, I think this is well within the scope of the original --

MR. FOLEY: It's beyond the scope of the report.

THE COURT: I understand that's the argument. Go ahead.

MR. FEENEY: Okay, it's well within the scope of the report. Dr. Henzes talks about the, "Mechanism of the patient's injury would be the osteoporotic state of her bones. The pivoting that she was attempting would be very similar to what she did each day, getting in and out of the bed to get into her wheelchair to participate in the activities in the nursing home. The only real difference would be the stool that she would step on to sit on the table. The records reflect that he was assisting her at the time and she lost her balance and fell and does not appear at any time she tried to navigate onto the stoo[l] itself." That's well within what he testified to.

MR. FOLEY: It's actually contrary as to the causation and what he said in his report. She [sic] says in the report that she lost her balance and fell.

MR. FEENEY: He talks about the pivoting.

MR. FOLEY: He talks about the pivoting. But he doesn't say that's the causation and that's what you're trying to get in, exactly what the court's order was protecting in the [S]econd [R]eport.

THE COURT: Okay, let me hear from them. Go ahead.

MR. FEENEY: It's well within the scope of his report. He talks about the pivoting. He talks about the nature and the osteoporotic nature of her bones. That's well within -- what he testified to is exactly within the scope of this report.

MR. KERIS: That's exactly what he has in this paragraph. It's within the four corners. It's nothing new. It's nothing new.

MR. FOLEY: It sure is. That's why we filed a motion in the beginning with respect to that.

MR. FEENEY: Before --

MR. FOLEY: And that's when you came forward with the [S]econd [R]eport.

THE COURT: Let's go ahead and then I'm going to --

MR. FEENEY: One final thing, your Honor, is before that motion was ever filed about the [S]econd [R]eport, your Honor ruled in motions in limine that the subsequent fall in 2012 was fair game for this case because of defendant's theories about the nature of this break coming from the osteoporotic bones. So you --

THE COURT: That's your --

MR. NEALON [(TERRENCE NEALON, JR., ESQ., CO-COUNSEL FOR PLAINTIFFS)]: Your order spoke to the mechanism of the injury, not as to the cause of the fall. He's misreading your order, your Honor.

THE COURT: Right. The issue here is a somewhat refined issue in the sense that the doctor in this case said the mechanism of the injury would be due to the osteoporotic bone. That means that I might have fallen and not broken my ankle. She had osteoporotic bones, therefore the mechanism of the injury would be due to the osteoporotic state of the bones. Then, he talks about the pivoting, okay? But, then, he says that, "The records reflect that Mr. Guse was assisting her at the time she lost her balance and fell. It does not appear she at any time tried to navigate onto the stool herself. Meaning the fall through loss of balance took place during the transfer." That's your argument. That's the way you --

MR. FOLEY: Yes, absolutely.

THE COURT: Now, let's assume for purposes of discussion that I were to favorably entertain that argument, the horse is out of the barn, how do I correct it?

MR. FOLEY: I know, that's where we're debating on the mistrial.

THE COURT: Yeah.

MR. FOLEY: Which I don't want to do.

THE COURT: Yeah, I know. We've had that discussion already today.

MR. FOLEY: Judge, I want -- I would suggest that you instruct the jury that the testimony that they had heard is contrary to the -- to the report --

(Mr. Foley and Mr. Foley had a discussion off the record.)

THE COURT: Who is going to say it? The last time I heard, you were a member of the Bar here. What do you have to go through him for? But, go ahead.

MR. FOLEY: He's smarter than I am.

THE COURT: I don't know about that, but go ahead.

MR. [MICHAEL] FOLEY: First, Judge, that this is a direct violation of the court's order. On the pretrial that they have introduced a separate causation theory that was not properly addressed in the initial report is actually contrary to what was stated in the initial report, inconsistent, contrary. And because of that, we didn't go out and [find] experts to rebut that. And that's why I believe it was excluded. But I'm not going to read into your reasons. But it's hard to put the Genie back in the bottle now that they've put this in. Especially, when it's a specific discussion as I understand it that this was not going to be allowed if it wasn't in the initial report. And it's clearly not. So, the proper remedy should be the mistrial and payment of costs. But alternatively, if you're not going to give that, I think you have to tell the jury --

THE COURT: I'm not sure that's what the chief counsel wants in this case either, but go ahead.

MR. M. FOLEY: But alternatively, I think that you need to give the specific -- strike that testimony from the record and tell the jury that there's no evidentiary basis for what the doctor just said and that this fall was caused by osteoporosis. The testimony was that she lost her balance, whatever. And that the fracture, that there's no evidence in this record that the fracture was caused by osteoporosis and therefore caused the fall.

THE COURT: From a causation standpoint, but I know what you're saying, go ahead.

MR. FEENEY: Your Honor, first of all, Attorney Mike Foley who is speaking now has first appeared in this trial this afternoon. So he was not here for any of the witnesses beforehand to state what the evidence was in this case. In fact, the evidence does not support what he said. The

evidence is that no one's sure why she fell. In fact, Jeff Guse testified and was called in plaintiff's case that she got to the end of the spin and just collapsed spontaneously. And there's been no testimony from the plaintiffs to rebut that testimony that she collapsed spontaneously. Dr. Henzes talks about pivoting and osteoporotic and he said it's either because it fractured and snapped. And he reviewed the depositions in which there's testimony and there will be introduced testimony in the defendant's case that one of the witness's [sic] said that Mrs. Carlitz reported that she heard a snap and then fell. So there will be evidence in this case. In fact, that's completely in line with what occurred in this case that it either was because of a low level trauma as Dr. Henzes explained or because [of] pivoting. And, in fact, plaintiffs introduced Dr. Thomas' testimony that the nature of the injury in this case when he was asked what the level of trauma was, he said the nature of the injury in this case was a twisting injury which is exactly consistent with what Dr. Henzes is talking about. Pivoting, it snaps and the patient falls or the patient slips and then it snaps because of the osteoporosis. It's exactly what he said in his report and it's exactly consistent with Dr. Thomas' testimony and what was in the depositions that he reviewed and in line with what one [of] the witnesses will testify to later in the trial.

MR. FOLEY: No.

THE COURT: That's all that, how can I put it, that's a wonderful reflection that you've given us, but I've got to look at the four corners of the report. Again, the one having been very, very late and in violation of my scheduling order. So when I look at Page 2, 0488 Bates, it says, "The mechanism of the patient's injury would be due to the osteoporotic state of the bone." Her injury was a fracture. So I'm thinking and reading this to say, the mechanism of her fracture would be due to the osteoporotic state of the bone. So when I read that, that tells me that if I [fell], my bone would not have broken. Then, he says, "The pivoting that she's attempting to do would

be very similar to what she would do each day getting in and getting out of bed and into her wheelchair and participating in the activities of the nursing home. The only difference would be the stool that she would step up onto to sit on the exam table. The records reflect that Mr. Guse was assisting her at the time she lost her balance and fell. It does not appear that at any time she tried to navigate onto the stool herself."

MR. FEENEY: Right, but --

THE COURT: Go ahead.

MR. FEENEY: The nature of the injury is the osteoporotic bone. She's twisting and it snaps and she falls.

MR. NEALON: That's not what he said.

THE COURT: That's not what he says.

MR. FEENEY: That's what he says. She lost her balance because it snapped.

MR. NEALON: Not what he says.

MR. FOLEY: No, she lost her balance.

THE COURT: I'm going to read what he said in his report and I'm going to hold him to that.

MR. KERIS: That's fine.

THE COURT: That's all, okay? I'm going to read what I just read to you guys and do a curative and say, there was no alternative theory. This is the operative paragraph. Take it under advisement as I read it to you. And I'm going to deny the motion for mistrial. You're welcome. And I'm going to do a curative that basically is the reading of this, okay.

(Sidebar discussion concluded.)

THE COURT: Ladies and Gentlemen of the jury, I want to talk to you a little about the objection and sidebar we just had. In the report that is authored by Dr. Henzes dated August 19th, 2014 -- and I'll let you know what I'm reading from, doctor, so you can read along with me. On Page 2, second paragraph where it starts, "The mechanism of," do you see where I'm talking about? "The mechanism of the patient's injury."

THE WITNESS: Yes.

THE COURT: Okay, now, there's an issue as to whether we're talking about causation. In other words, the dispute being, did she fall and the leg break as the cause so the fall would have been the cause of it? And the mechanism was -- I'm going to read to you what he says in the report, okay? And then, I'm going to talk to you a little bit about how it works. Because when you get a verdict slip in this case, the first question is going to be[:] "Do you find that the defendant was negligent or did you find that the defendant violated the standard of care?" That's why they're talking about the standard of care here. A violation of the standard of care is negligence in Pennsylvania. And then, the next one would be, "Did the violation cause the injury?" Okay, was the person harmed, is their factual cause of harm from that violation of standard of care? And I think one of the lawyers made reference to it in the opening. You can run a red light and not hit anything and nobody hits you and you were negligent but you got away with it because there was no damage, no harm, okay? Well, in this particular case, the alternative theories that the doctor just talked about don't necessarily reflect the wording in his report. So I want to read to you the specific wording in Dr. Henzes' report and kind of we're going to hold him to that, okay? And this was what the report says. Actually, if somebody could put it up and highlight it? It's Bates 4088?

MR. FEENEY: No, 0488.

- 27 -

THE COURT:  0488, you're right.

MR. KERIS:  Second paragraph.

THE COURT:  And then, in the second paragraph. Yeah, make it big.  And then, where it starts, "The mechanism," take it yellow all the way to the end. Thank you.  Alright, now it's not like Sing Along with Mitch, read along with the Judge.  But here's what I want you to understand.  The report says, "The mechanism of the patient's injury would be due to the osteoporotic state of her bones."  Now, you have to determine what that means, okay?  It might mean, if you fell, you wouldn't have broken your bones because you're not an osteoporotic.  But that's what he says.  Then, it says, "The pivoting that she was attempting to do would be very similar to what she would do each day getting in and out of bed and into her wheelchair to participate in the activities at the nursing home.  The only difference would be the stool that she would step up onto to sit on the exam table.  The records reflect that Mr. Guse was attempting her--" I'm sorry, ". . .was assisting her at the time she lost her balance and fell.  It does not appear that at any time she tried to navigate onto the stool herself."  That's the testimony that the doctor, any expert that generates a report is held to the fair scope of the four corners of the document. So that's what you need to digest as far as the testimony of Dr. Henzes is concerned.  Okay, now he's your witness.

MR. KERIS:  Thank you, your Honor.

Notes of testimony, 4/29/15 at 60-75.

Attorney Keris resumed his questioning of Dr. Henzes.  The trial court did overrule an objection by plaintiffs' counsel and allow Dr. Henzes to answer general questions about osteoporosis and spontaneous fractures. (*Id.* at 78-80.)  However, on redirect examination, defense counsel asked

Dr. Henzes, "Now, can a patient have a break and then a fall?" (***Id.*** at 114.)

Dr. Henzes answered, "Yes." (***Id.***)  Plaintiffs' counsel lodged an immediate

objection, which the trial court sustained and then instructed the jury to

disregard Dr. Henzes' answer:

> THE COURT:  Sustained.  You're going on the area that we already covered and it's in the new report. It's not allowed.  Disregard that testimony.  That was a conceptual question about the patient generally and not the patient in this case.
>
> MR. KERIS:  Your Honor, I believe he opened the door on it, but I'll respect your decision.
>
> THE COURT:  Thank you.

***Id.*** at 114-115.  Another lengthy sidebar discussion followed:

> MR. FOLEY:  Once again, Mr. Keris has violated the court's order prior to the case starting.  He's disregarding your order at prior sidebar.  He keeps bringing up a causation issue with this witness.  And it's at a point where I have to move for a mistrial.  I mean, this is deliberate.  He consciously did it in violation of your orders prior previously [sic].  This is polluting this jury.
>
> THE COURT:  Go ahead.
>
> MR. KERIS:  Your Honor, I believe he opened the door when he asked questions on his examination about twisting and snapping and having him explain that paragraph.  He opened the door on that.  I've been with you enough to know that if more people that if they open the door on those things, you can go down that route.  I got the question out.  There was an objection.  There was no answer and you sustained the objection.  There's no tainting of this jury.

THE COURT: Oh no, there was an answer. That's why I told them to disregard it. And I said it was a conceptual patient, not this patient.

MR. KERIS: I'm sorry and the record will reflect that. But when they opened the door, I believe it's fair game.

THE COURT: But, you know, let's assume for -- wait a minute, wait a minute. Let's assume for purposes of the discussion that I buy your argument [that the door had been opened during cross], the proper procedure is to request a sidebar before you open the avenue of inquiry. That's the way it should have been handled. The proper way of handling that under the circumstances would have been for you to say, may I have a sidebar and I'm going to go into this? And I would have ruled before it came out. Because you knew that was hanging there from the prior motion in limine and from the prior sidebar we had. You know, let me give them a brake [sic] and we'll talk about this a little longer.

(Sidebar discussion concluded.)

Notes of testimony, 4/29/15 at 116-117.

THE COURT: Alright, so let's kind of wrap this up at sidebar here. So what I was saying and I guess we don't have to worry about the jury hearing right now. But what I was saying was, I was going to -- I was actually tempted to interrupt you and caution you. And I don't like to interrupt counsel, so I didn't do it thinking that I was reading your direction incorrectly. And when it came out and the objection came, I tr[ied] to put that Genie back in the bottle as fast as I could by indicating that that was a conceptual patient being discussed, not this patient and the jury should disregard it. And that's the reason why I handled it abruptly and kind of cut you off. But it should have been, when you knew you were going onto quick sand, you should have talked to the court about building a bridge first, do you know what I'm saying?

*Id.* at 118-119.

After further discussion, the court ultimately concluded that the door had not been opened to Guse's attorney's question. (*Id.* at 121-125.) The court then stated:

> Well, we're into this long enough where I'm going to not give you the mistrial, but I'm going to reinstruct them. I'm going to put it back on the board and tell them that's what they have to decide. And I'm doing that for a particular reason which I'll tell you when the case is over. Go ahead, what?
>
> MR. M. FOLEY: In addition to whatever other directions that you thought were appropriate, Judge, I believe that it would be appropriate for your Honor to direct the jury to disregard any evidence, argument or suggestion that [Mrs. Carlitz's] fall was caused by a spontaneous fracture and that is not in this case and should not be considered by them in any respect in this case.
>
> THE COURT: I'm not going to take the factual determinations away from the jury. I'm going [to] show them that paragraph again and tell them they have to decide what precipitated the fall. They have to decide. Was it by -- I'm not even going to get into what the theories are.
>
> MR. M. FOLEY: Well, then, you're going to allow them to basically take the spontaneous fracture --
>
> THE COURT: I'm going to allow them to interpret the report as the fact finder.
>
> MR. M. FOLEY: I believe that that would be highly inadequate and we would object to that.
>
> MR. FOLEY: It goes --

- 31 -

THE COURT: Make whatever record you've got to make. Go ahead, make it.

MR. FOLEY: Alright, it's directly contrary to the court's ruling previously. He's trying to get in the back door what he couldn't do directly. And that's what he's done. He's got that in now and he's polluted the jury.

MR. M. FOLEY: Judge, this is Mike Foley. By allowing the jury--by giving that type of instruction to the jury and not excluding this spontaneous fracture issue that was not properly supported by pretrial expert reports served [] in an appropriate time in accordance [with] the court's order, we did not have appropriate time or ability to file any rebuttals. And, you know, we're sitting here naked and you're going to allow this jury --

THE COURT: And therefore, you're prejudiced. And I'm letting you put your prejudice on the record. I have no problem with you making a record.

MR. M. FOLEY: That's all I'm doing.

THE COURT: Both of you, make whatever record you want to make. I'll make my ruling. And let's see how the case goes. Let me tell you why. Because if you prevail, it's moot, okay. And if you don't, you've made your record. So, why not proceed under the assumption that this might moot itself by going to a successful conclusion, especially since we're halfway through it. By the way, in my -- I've only had the first mistrial I ever had last week with Gene. But I've avoided three of them by doing [sic]. So you flip the coin and sometimes it works. So that's my reason why, okay?

*Id.* at 125-128.

After Dr. Henzes' testimony had concluded, the trial court gave the jury the following instruction:

THE COURT: Okay, I'm going to give the correction that I talked to you about at sidebar. And I wanted to do it before we dismiss the witness. If you could cue up 0488 again, please? And highlight it the way it was highlighted last time? Ladies and Gentlemen, this is for purposes of the record as well, I have, again, placed the end of the second full paragraph on Bates stamp Page 0488. And it is highlighted. And I'm doing that because I want you to understand that this is a key issue that you have to decide. You, the jury, have to decide this. It's [sic] says, "The mechanism of the patient's injury would be due to the osteoporotic states [sic] of her bones." You have to determine what that means. Does it mean that if I fell it might not break? And if you [fell], it might not break? But she broke [her ankle] because she's osteoporotic? You have to determine what that means. You also have to determine the next sentence. "The pivoting that she was attempting to do would be very similar to what she would do each day getting in and out of bed to get into her wheelchair to participate in activities at the nursing home. The only difference would be the stool that she would step up onto to sit on the exam table. The records reflect that Mr. Guse was assisting her at the time she lost her balance and fell. It does not appear that at any time she tried to navigate onto the stool herself," meaning herself unassisted, I believe. But once again, these issues are the issues that you have to decide. You are the finders of fact as I told you when I gave you your preliminary instruction on Monday, you're the sole and exclusive judges of the facts in this case. And neither I nor anything that the lawyers say can impinge or infringe upon that exclusive responsibility that you have. So pay attention to that. And then when you deliberate, you make a determination as to what you think it means and how it should be applied given the facts and circumstance[s] as you find the true facts to be in this case. And I also want to caution you that the other exchange that I said that was dealing with a hypothetical patient, you are to disregard.

*Id.* at 137-139. Ultimately, as stated above, trial resulted in a defense verdict, the jury finding that Guse's conduct did not fall below the applicable standard of care.

As a threshold matter with regard to the first violation, Guse contends that the appellees/plaintiffs were untimely in their objection to Guse's counsel's remarks during his opening statement, and, therefore, they waived an objection to those remarks based on the contemporaneous objection rule. *See Commonwealth v. Griffin*, 412 A.2d 897, 901 (Pa.Super. 1979) ("Case law in this jurisdiction has consistently held that the cornerstone of our waiver doctrine is that issues below not raised in a timely manner are foreclosed for purposes of appellate review. In the vast majority of cases, the rubric 'in a timely manner' requires contemporaneous objection; and our rules and cases rigorously enforce the contemporaneous objection rule." (citations omitted)).

Both Guse's and Delta Medix's attorneys offered opening statements, and Guse's counsel spoke first. (*See* notes of testimony, 4/28/15 at 28-45 (Guse's counsel's opening); *id.* at 45-56 (Delta Medix's counsel's opening).) Subsequently, the trial court issued some preliminary instructions to the jury. (*Id.* at 56-58.) Then, after the trial court instructed plaintiffs to call their first witness, plaintiffs' counsel requested a sidebar, at which time a mistrial was requested due to Guse's counsel's purported violation of the Court Order. (*Id.* at 58-59.) Thus, plaintiffs' counsel did not object when

the statements were made, but instead waited through both Guse's and Delta Medix's opening statements, and the court's subsequent instructions to the jury, before objecting to Guse's counsel's remarks regarding the theory of causation. On this basis, Guse contends that appellees' request for a mistrial was waived because it was not made in a timely manner.

Appellees counter that it is "customary" to wait until after opening remarks are concluded to object to statements made therein, citing *Commonwealth v. Adkins*, 364 A.2d 287 (Pa. 1976), and *Mirabel v. Morales*, 57 A.3d 144 (Pa.Super. 2012). Guse cites, for the opposite conclusion, *Mecca v. Lukasik*, 530 A.2d 1334 (Pa.Super. 1987), and *Harman v. Borah*, 756 A.2d 1116 (Pa. 2000).

In *Adkins*, a criminal case, the defendant waited until after the Commonwealth's closing to object to a questionable remark made by the prosecutor regarding the use of a prior inconsistent statement. Our supreme court held that:

> Under the circumstances and particularly since the argument was recorded and its content undisputed, the trial court had adequate warning of the nature of the objection to the closing argument before its charge to the jury and was provided with adequate opportunity to correct the effect of the assistant district attorney's improper argument.

*Adkins*, 364 A.2d at 290. Our supreme court noted that "the correctness of the applicability of the [contemporaneous objection] rule must be assessed in light of the attending circumstances[,]" as the:

> rule was forged as a matter of necessity to ensure an adequate and correct record on appeal. Where the argument is not recorded, there is a need to require an objection during the argument so that the remarks may be placed in the record at or about the time they are made and thereby ensure accuracy. Otherwise, the recollection of both counsel and the court at the conclusion of the argument may differ and thereby result in unnecessary factual disputes.

*Id.* at 291.

In *Mirabel*, this court reiterated the *Adkins* standard in a civil setting. Notably, the *Mirabel* court addressed an objection that occurred after "all parties had closed[,]" suggesting that an objection to the content of an opening or closing argument is not waived simply because it did not immediately follow the opening or closing argument at issue. *Mirabel*, 57 A.3d at 149 n.5.

By contrast, in *Mecca*, this court held that the "[a]ppellants' objection [to comments made during the plaintiffs' opening argument] came too late when they waited until the plaintiffs' attorney completed his opening argument." *Mecca*, 530 A.2d at 1345. Yet, there is no discussion in *Mecca* regarding whether the opening in question was recorded, nor was there any attempt to distinguish that case from what had occurred in *Adkins*. However, the *Mecca* court cited and relied on *Fretts v. Pavetti*, 422 A.2d 881, 884 (Pa.Super. 1980). In that case, the post-opening-statement objection was to an "unrecorded argument[,]" thus making it untimely under *Adkins* and similar authorities. *Fretts*, 422 A.2d at 884. By relying on

*Fretts*, it is clear that the *Mecca* court was addressing the timeliness of an objection made to the content of an unrecorded opening statement.

*Harman* is decidedly off-point. In *Harman*, the court applied the contemporaneous objection rule, but the delayed objection at issue was to the trial court's engagement in an off-the-record discussion with an expert defense witness in front of the jury in the middle of trial. Clearly, the *Adkins*, *Mirabel*, and *Mecca* decisions are more applicable to the instant matter.

After reviewing these authorities, we agree with appellees that their objection was timely. The facts of this case most closely resemble those of *Mirabel*, as the objection at issue here was lodged soon after both defendants' attorneys had concluded their opening remarks. Guse does not argue, nor can we ascertain on our own, why waiting until after the trial court issued a short preliminary instruction to the jury, given immediately after the opening remarks had concluded, rendered *Mirabel* inapplicable to this case. The instruction given to the jury only encompassed two full pages of the trial transcript (*see* notes of testimony, 4/28/15 at 56-58), a relatively trivial amount of time. Thus, we decline to hold that appellees waived their objection to Guse's counsel's opening remarks.

Turning to the substance of the issue, it appears that the trial court was more concerned with the untimeliness of the Second Report at the time the motion *in limine* was granted. Clearly, however, the spontaneous

fracture theory of causation was absent from the First Report. In the August 19, 2014 First Report, Dr. Henzes stated that "in attempting to turn and sit down, [Mrs. Carlitz] fell and suffered a grade III A open fracture. . . ." He referred to the mechanism of Mrs. Carlitz's injury as being due to the osteoporotic state of her bones. Dr. Henzes also indicated that Mrs. Carlitz was executing a pivoting maneuver, "very similar to what she would do each day," and mentioned that she had a history of falling. However, in the First Report, Dr. Henzes never opined that Mrs. Carlitz sustained a "spontaneous fracture" of her left ankle which caused her to fall. In fact, he explicitly stated that while she was being assisted by Guse, "she lost her balance and fell." This spontaneous fracture theory, a completely new theory of causation, was not advanced until Dr. Henzes' Second Report, submitted less than one week before trial and excluded by the Court Order granting the plaintiffs' motion *in limine*.

After opening statements, when addressing the plaintiffs' initial motion for mistrial, the trial court warned defense counsel to "handle that very carefully" when presenting Dr. Henzes' testimony. (Notes of testimony, 4/28/15 at 60.) Then, at sidebar prior to Dr. Henzes' direct examination, the trial court elaborated that "He can say what's in his [F]irst [R]eport." (Notes of testimony, 4/29/15 at 48.) The trial court told defense counsel that "the phraseology that he used in describing his description of how this wound might have occurred has to be that phraseology from his

[First] [R]eport and not his [S]econd [R]eport." (*Id.* at 49.) Put in context, it should have been obvious to the defendants that they were to avoid any mention of the spontaneous fracture theory from Dr. Henzes' Second Report. Defense counsel should have instructed Dr. Henzes accordingly. Yet, they elicited testimony on direct examination that Mrs. Carlitz could have broken her ankle during the pivot maneuver, causing her to collapse and fall onto the floor. (*Id.* at 60.) This causation theory was simply not in Dr. Henzes' First Report and was specifically excluded.

The trial court instructed the jury that Dr. Henzes was to be held to what was within the fair scope of his First Report, which clearly did not include a spontaneous fracture theory. (*Id.* at 73-75.) The trial court denied the plaintiffs' second motion for a mistrial. (*Id.* at 71.) Yet, inexplicably, defense counsel persisted, asking Dr. Henzes, "Now, can a patient have a break and then a fall?" (*Id.* at 114.) At this point, we agree with the trial court that counsel's conduct could fairly be characterized as "reckless." (Trial court opinion, 7/15/15 at 7-8.)

Furthermore, we disagree that plaintiffs' counsel somehow "opened the door" to this testimony on cross-examination. Attorney Foley asked Dr. Henzes about competing versions of how Mrs. Carlitz fell; Mrs. Carlitz testified in her deposition that she fell backwards and struck the wall before landing on the ground and breaking her left ankle, whereas Mr. Guse testified that when she got up onto the step, she turned around and then

suddenly fell. (Notes of testimony, 4/29/15 at 103.) Dr. Henzes testified that if Mrs. Carlitz had fallen backwards and hit the wall, he would have expected her to have additional injuries. (*Id.* at 104-105.) At sidebar, the trial court rejected the defendants' assertion that Attorney Foley had opened the door to their question on redirect:

> THE COURT: They weren't discussing mechanisms in that examination, they were discussing different witnesses['] versions of how the fall took place.
>
> MR. FEENEY: Right, which it involved the --
>
> THE COURT: In other words, they were discussing Mrs. Carlitz's version and they were discussing Mr. Guse's version. And that's what they were discussing. Not the mechanism as to whether it was a spontaneous osteoporotic cause that made her fall. They were talking about how the physical characteristics of where she was standing, what direction she was looking and stuff like that differed between Guse and Carlitz. That's my recollection of it.

*Id.* at 121-122. We agree. Furthermore, we agree with the trial court that, by the time Guse's counsel began redirect examination of Dr. Henzes, he should have sought permission from the court to ask such a question, as the topic had already been the subject of two prior motions for a mistrial and a lengthy curative instruction. Given the way the case had developed, Guse's counsel can be faulted for his approach to the topic during his redirect examination of Dr. Henzes, and he violated the Court Order as it had been

interpreted by the court through the course of the trial. Accordingly, we conclude that a violation of the Court Order occurred.[6]

Pursuant to our standard of review, we now turn to the question of whether the trial court abused its discretion in granting a new trial. The trial court stated as follows:

> In addition to the explicit Court Order precluding any reference to the supplemental report and warnings given prior to Dr. Henzes taking the witness stand, there was a sidebar after each and every one of the objections to the improper remarks and references. Still, this did not prevent counsel from defiantly discussing, or attempting to discuss, subject matter that was strictly prohibited by the [c]ourt. In light of the fact that there was a Court Order precluding such references and remarks, and the fact that there were warnings and previous sidebar discussions regarding the very issue, counsel should have proceeded with great caution in addressing items even remotely close to the alleged new causation theory listed in the supplemental report.

Trial court opinion, 7/15/15 at 8.

---

[6] Defense counsel also argued that Dr. Gregory Thomas testified that the mechanism of Mrs. Carlitz's injury was a twisting injury, consistent with Dr. Henzes' testimony. (*Id.* at 69, 120.) Dr. Thomas was the orthopedic surgeon who fixed and set the fracture. (*Id.* at 22.) However, Dr. Thomas did not testify that Mrs. Carlitz's injury was the result of a spontaneous fracture due to osteoporosis. Similarly, Dr. Edward Zurad testified that Mrs. Carlitz had osteoporosis with a history of recurrent falls and that she fell during the pivot maneuver, sustaining an open fracture of the tibia, ankle dislocation and a fracture of the fibula. (Notes of testimony, 4/30/15 at 33, 47, 52-53, 56.) However, Dr. Zurad could not testify with certainty what caused Mrs. Carlitz's leg to snap, whether it occurred during the pivoting process or from hitting the floor. (*Id.* at 74.) Furthermore, Dr. Zurad is a family physician and geriatrician, not an orthopedist. (*Id.* at 4-5.) Dr. Zurad also testified after Dr. Henzes.

The [c]ourt is of the opinion that counsel for Defendant Guse acted recklessly at best when he continued to make reference to the excluded supplemental expert report. This resulted in the jury being exposed to the pervasive testimony and references regarding the alleged new theory of causation from an excluded report due to its untimeliness. Despite the repeated attempts to provide the jury with curative instructions, [p]laintiffs' counsel correctly noted that they were prejudiced by the inadequacy of a curative instruction[.]

*Id.*

Although the [c]ourt initially denied [p]laintiffs' Motions for a Mistrial, it expressly stated that the denial was an effort to prevent a waste of resources. The third violation of the Court Order occurred roughly half way through the trial, and rather than declaring a mistrial, the [c]ourt believed the correct approach would be to move forward with the trial since the [p]laintiffs may prevail, and the issue would therefore become moot.

*Id.* at 9.

As it turned out, the jury rendered a verdict in favor of the [d]efendants. Plaintiffs ultimately bear the burden of demonstrating a mistake occurred at trial, and that the mistake warrants granting a new trial. We believe the [p]laintiffs have met their burden. We believe the reckless insertion of an excluded and new causation theory was highly prejudicial to the [p]laintiff[s]. In order to remedy the prejudice that resulted from mistakes made at trial, which were in our estimation far more than mere harmless error, the [c]ourt finds it necessary to grant the [p]laintiffs a new trial as to all issues to rectify the injustice that would result if the present verdict were left to stand.

*Id.* (internal citations omitted).

Ideally, the trial court would have made a clear and unambiguous determination prior to trial that the untimely Second Report contained a new theory of causation, *i.e.*, the spontaneous fracture theory, which could not be referred to in any way at trial. However, we believe it is clear from the overall record that the defense was not supposed to pursue the spontaneous fracture theory contained in Dr. Henzes' Second Report at trial, and did so anyway. Given this court's deferential standard of review, we cannot conclude that the trial court abused its discretion in granting the plaintiffs a new trial. They had no time to prepare a rebuttal to this new defense theory or obtain another expert. The prejudice to the plaintiffs was substantial. We will not disturb the trial court's judgment in this regard.

Guse contends that any possible prejudice was adequately cured by the trial court's immediate instructions to the jury to disregard Dr. Henzes' testimony. (Appellant's brief at 24-25.) As stated above, the trial court determined that its curative instructions were insufficient. Where, as here, a trial court determines that a new trial is necessary based upon the introduction of inadmissible, prejudicial evidence at trial, and that a curative instruction was insufficient to cure the prejudice caused by the introduction of the evidence, an appellate court "may only reverse in such a case if the trial judge is guilty of a gross abuse of discretion." *Boscia v. Massaro*, 529 A.2d 504, 505 (Pa.Super. 1987), *appeal denied*, 538 A.2d 874 (Pa. 1988). In *Boscia*, this court stated that "[t]hough an appropriate charge may

correct harmful error, improperly admitted evidence may be so prejudicial that a new trial is required." *Id.* at 507; *see also id.* (upholding the trial court's grant of a new trial, which was based upon defense counsel's introduction of inadmissible, prejudicial testimony at trial, and holding that the trial court did not err in finding that the curative instruction that it gave to the jury regarding the inadmissible testimony was insufficient to cure its prejudicial impact on the jury).

Guse argues that any violations of the Court Order were necessarily harmless given the nature of the jury's verdict. A new trial is only warranted when the errors under review (or, in this case, the violations of the Court Order) "may have affected the verdict." *Boyle v. Indep. Lift Truck, Inc.*, 6 A.3d 492, 494 (Pa. 2010). As described above, the jury never reached the issue of causation. The jury found that Guse's conduct did not fall below the applicable standard of care and that he was not negligent. Guse argues that because the jury found him not to be negligent, any violation of the Court Order regarding causation could not have contributed to the verdict and was therefore harmless. (Appellant's brief at 34-36.) We disagree.

We find *Williams v. McClain*, 520 A.2d 1374 (Pa. 1987), to be instructive. In that case, the plaintiff, Jean Baker Williams, was born with a congenitally dislocated hip and underwent multiple surgeries. *Id.* at 1375. Eventually she visited the defendant, Dr. Edward McClain, who performed a total hip replacement, implanting a McKee-Ferrar type prosthesis. *Id.* After

the operation, Williams continued to experience pain and a second type of false hip was implanted, replacing the McKee-Ferrar device. *Id.* After this operation, an infection developed, as well as bleeding, necessitating several additional procedures. *Id.*

Williams brought a medical malpractice action against McClain on the basis of negligence and lack of informed consent. *Id.* Following a jury trial, McClain was found not liable. *Id.* On appeal, Williams argued, *inter alia*, that the trial court erred in admitting into evidence a social worker's report, which noted Williams' financial problems and also stated, in relevant part, "Mrs. Williams revealed instability and frustration when discussing her environmental circumstances which must contribute to much aggravating stress for the patient, possibly aggravating the existing physical problem." *Id.* at 1375-1376. The social worker did not testify at trial. This court found the report was admissible as an exception to the hearsay rule under the Business Records Act, 42 Pa.C.S.A. § 6108. *Id.* at 1376.

Our supreme court reversed, citing case law holding that opinion evidence contained in hospital records is inadmissible. *Id.* The social worker's report contained opinion evidence that Williams was unstable and frustrated, and her pain may have had a psychosomatic source. *Id.* at 1377. Furthermore, the social worker was unavailable for cross-examination and there was no evidence to show that she was qualified to make such a

diagnosis. *Id.* Therefore, admission of the report into evidence through the Business Records Act was error. *Id.*

Next, the court in *McClain* addressed the trial court's determination that even if admission of the evidence was error, it was harmless where the evidence only related to the issue of damages and the jury found McClain not liable. *Id.* at 1378. The *McClain* court rejected this position, stating:

> Upon a proper consideration of the record we hold that the social worker's report related to the liability issue of causation, as well as damages, and so was harmful to Williams. To prove her case Williams had to show that McClain's negligence was the proximate cause of her present injuries. Based on the social worker's opinion, it is possible that the jury found that these injuries would have existed with or without negligence on the part of McClain.

*Id.* The court in *McClain* also observed that the social worker's report tended to weaken Williams' credibility, and in deciding the informed consent issue, the jury was asked to decide whom it believed. *Id.*

Similarly, here, Guse argues that even if the defense violated the Court Order, it did not prejudice the plaintiffs where the jury never reached the issue of causation. However, it seems that under the unique factual circumstances of this case, Dr. Henzes' opinion that Mrs. Carlitz spontaneously fractured her ankle <u>before</u> she fell, as a result of pivoting from the stool onto the exam table while being assisted by Mr. Carlitz and Guse, does go to negligence and not just causation. It would basically be impossible for the jury to find Guse breached the applicable standard of care

if it believed Mrs. Carlitz suffered a spontaneous fracture due to her osteoporotic bones while performing a simple pivoting maneuver that she did every day. As plaintiffs/appellees contend, the issues were intertwined.[7]

Guse claims that the jury rejected the plaintiffs' theory that Guse breached his duty to Mrs. Carlitz by failing to perform the ultrasound tests while she remained in her wheelchair, which was an option. (Appellant's reply brief at 8.)[8] According to Guse, if the plaintiffs failed to prove that he breached the standard of care by not performing the ultrasound in the wheelchair, then the cause of Mrs. Carlitz's fall is irrelevant. (*Id.* at 9.) However, conceivably the jury could have found that Guse was not negligent for taking Mrs. Carlitz out of her wheelchair, but for failing to prevent her from losing her balance and falling off of the stool.

---

[7] The trial court addressed the issue as follows:

> The [c]ourt will address [d]efendants' argument that because the jury determined [d]efendant Guse did not violate the applicable standard of care, issues of causation were moot and should not be considered. This argument is disingenuous because the verdict was the product of a polluted record of evidence, and therefore negates [d]efendant's arguments that the tainted verdict should hold persuasive value.

Trial court opinion, 7/15/15 at 5 n.1 (citation to counsels' arguments omitted). We agree. It is likely that the jury may have conflated or confused the issues of standard of care and causation in light of Guse's counsel's repeated violations of the Court Order.

[8] Appellant's reply brief is unpaginated; page numbers are by our own count.

In addition, as in **McClain**, the issue goes to credibility because Mrs. Carlitz testified that she fell backwards into the wall before hitting the floor. (Notes of testimony, 4/29/15 at 103.) This conflicted with Guse's deposition testimony in which he described Mrs. Carlitz mounting the step, turning around and then suddenly collapsing, which seems more consistent with Dr. Henzes' spontaneous fracture theory. (**Id.**) Guse testified that she fell and remained on the step in an Indian-style seated position. (**Id.** at 104.) Dr. Henzes testified that if Mrs. Carlitz had fallen backwards as she claimed, he would expect to see additional injuries, including a possible concussion, fracture of the spine and soft tissue injuries. (**Id.** at 113-114.) This was consistent with Dr. Zurad's testimony that, in his opinion, Mrs. Carlitz did not fall backwards, but rather came straight down on the stool with her legs folded in front of her. (Notes of testimony, 4/30/15 at 28-29, 52-53, 74.) Therefore, if the jury believed Dr. Henzes' theory that Mrs. Carlitz sustained a sudden, devastating, and spontaneous open fracture of her left leg, they would be less likely to believe Mrs. Carlitz's version of the incident.

For these reasons, we affirm the trial court's order granting plaintiffs/appellees a new trial.

Order affirmed. Case remanded. Jurisdiction relinquished.

Stevens, P.J.E. joins this Memorandum.

Bender, P.J.E. files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2017